1    WO

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

8

9    ASARCO LLC,                                    No. CV-13-00686-TUC-CRP

10                      Plaintiff,                   **ORDER**

11   v.

12   England Logistics Incorporated, et al.,

13                      Defendants.

14

15          This action arises from a shipment of 55 copper anodes that went missing.

16   ASARCO alleges that in July 2011, ASARCO requested that Defendants CR England,

17   Inc. ("CR") and England Logistics ("EL") arrange for transport of 55 copper anodes from

18   ASARCO's facility in Hayden, Arizona, to ASARCO's facility in Amarillo, Texas ("the

19   Shipment").  (First Amended Complaint, ("FAC") ¶¶29; Doc. 101, p. 5).  ASARCO

20   alleges that CR/EL unilaterally re-brokered and/or re-assigned the Shipment to Defendant

21   Plumley Trucking, Inc., ("PT") who, thereafter, re-brokered and/or assigned the

22   Shipment through Defendant Plumley Logistics, Inc., ("PL") to non-party Pavlyukh

23   Express, whose driver Andriy Kuba picked up the Shipment on July 24, 2011.  (FAC,

24   ¶¶31, 34, 37, 39).  The Shipment never arrived at ASARCO's Texas facility and is still

25   missing.  (FAC, ¶¶ 38, 43).

26          ASARCO seeks relief as follows:  (1) against the Plumley Defendants under the

27   Carmack Amendment, 49 U.S.C. § 14706 (Count I); (2) alternatively, against all

28   Defendants for negligence (Count II); (3) alternatively, against all Defendants for

negligent hiring, retention, or supervision (Count III); (4) alternatively, against CR and/or EL for breach of contract (Count IV); and (5) alternatively, against the Plumley Defendants for breach of contract (Count V).  Counts II through V are alleged "in the alternative and in the event the Court determines Carmack is not applicable in this case." (FAC, ¶¶64, 75, 86, 92).

Defendants PL, PT and the England Defendants have filed separate motions seeking summary judgment.  (Doc. 90 (PL's motion); Doc. 98 (PT's motion); Doc. 100 (the England Defendants' motion)).  ASARCO has filed a Motion for Partial Summary Judgment ("MPSJ") against PL on the breach of contract claim (Doc. 101).  Additionally, PT joins in PL's motion and response to ASARCO's MPSJ, and the England Defendants join in PL's and PT's argument regarding pre-emption.

The Magistrate Judge has jurisdiction over this matter pursuant to the parties' consent.  *See* 28 U.S.C. § 636(c).  For the following reasons, the Court: (1) denies in part and grants in part the motions for summary judgment filed by Plumley Logistics and Plumley Trucking; (2) denies ASARCO's Motion for Partial Summary Judgment; and (3) grants in part and denies in part the England Defendants' Motion for Summary Judgment.

**BACKGROUND**

For purposes of PL's Motion, it is undisputed that in July 2011, ASARCO contracted with EL to transport and/or arrange for the Shipment.    (ASARCO's Controverting Statement of Facts Regarding PL's Statement of Facts and ASARCO's Additional Statement of Facts (Doc. 107), ¶A; PL's Statement of Facts (Doc. 91), ¶1; PL's Controverting SOF (Doc. 109), ¶3).  Thereafter, according to Tammy Foster, who testified that she is an employee of PL, EL contacted her for the purpose of "find[ing] a carrier to pick up the load."  (Doc. 107, Exh. A, pp. 9, 49; *see also id*. at p. 49 (in this case the carrier PL found to pick up the load was Pavlyukh Express)).

Despite Foster's testimony that she is employed by PL, ASARCO disputes whether Foster works for PL or PT.  This dispute is discussed in further detail *infra.*

It is undisputed that PL is authorized by the Federal Motor Carrier Safety Administration as a freight broker and does not have motor carrier authority.  (Doc. 91,

¶5; Doc. 107, ¶5).  It is also undisputed that PT is a federally authorized carrier.  (PT's Statement of Facts (Doc. 99), ¶14; ASARCO's Controverting Statement of Facts regarding PT's Statement of Facts (Doc. 113)¸ ¶C).

As discussed *infra*, PL and EL, and PT and the England Defendants, have entered into "Transportation Brokerage Agreements", respectively.

PL argues that it acted as a broker and is, therefore, not liable under the Carmack Amendment.  PL further argues that the Transportation Brokerage Agreements do not apply to the Shipment, and that ASARCO's negligence claims are pre-empted.  PT argues that it had no involvement regarding the Shipment, that the Transportation Brokerage Agreements do not apply to the Shipment, and that ASARCO's negligence claims are pre-empted.  CR argues that it had no involvement with the Shipment and, to any extent it did, it acted as a broker.  EL and CR both argue that ASARCO's state law claims are pre-empted.  ASARCO argues that PL breached the Transportation Brokerage Agreement.

**STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted).  Once satisfied, the burden shifts to the nonmoving party to demonstrate through production of probative evidence that an issue of fact remains to be tried.  *Id.* at 324.  At the summary judgment stage, the court must not weigh evidence or make credibility determinations.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  The nonmoving party's evidence is presumed true and all inferences are to be drawn in the light most favorable to that party.  *Eisenberg v. Insurance Co. of North Amer.,* 815 F.2d 1285, 1289 (9th Cir. 1987).

Only disputes over facts that might affect the outcome of the suit will prevent the

entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson.,* 477 U.S. at 248. Thus, if the record taken as a whole "could not lead a rational trier of fact to find for the nonmoving party," summary judgment is warranted. *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 988 (9th Cir.2006) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). If the burden of persuasion at trial would be on the nonmoving party, the movant may carry its initial burden of production under Rule 56 by producing, "evidence negating an essential element of the nonmoving party's claim or defense…," or by showing, after suitable discovery, that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1105-1106 (9th Cir. 2000).

**CARMACK AMENDMENT CLAIM ALLEGED AGAINST THE PLUMLEY DEFENDANTS**

The Carmack Amendment, 49 U.S.C. § 14706, governs liability for all losses, damages or injuries to goods transported in interstate commerce. *Hewlett-Packard, Co. v. Brother's Trucking Ent.,* 373 F.Supp.2d 1349, 1351 (S.D. Fla. 2005); *Chubb Group of Insur. Co. v. H.A. Transportation Sys. Inc.,* 243 F.Supp.2d 1064, 1068 (C.D. Cal. 2002). The statute "subjects common carriers and freight forwarders transporting cargo in interstate commerce to absolute liability for actual loss or injury to property." *KLS Air Express v. Cheetah Transportation,* LLC, 2007 WL 2428294,*3 (E.D. Cal. 2007). A shipper, such as ASARCO, establishes a prima facie case of a carrier's liability under the Carmack Amendment by establishing by a preponderance of the evidence that the goods were: (1) delivered to the carrier in good condition; (2) the goods were damaged or lost while in the carrier's possession; and (3) damages. *Missouri Pacific R.R. v. Elmore & Stahl,* 377 U.S. 134, 138 (1964); *Chubb,* 243 F.Supp.2d at 1068. The Carmack Amendment limits recovery to actual damages. 49 U.S.C. §14706(a)(1).

While the Carmack Amendment applies to motor carriers and freight fowarders[1], the statute does not apply to brokers.  *KLS Air Express*, 2007 WL 2428294, at *3; *Chubb*, 243 F.Supp. 2d at 1069.  Under the Carmack Amendment, a "broker" is defined as:

> A person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal, or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation.

49 U.S.C. § 13102(2).  Federal regulations also specify that:

> A broker shall not, directly or indirectly, represent its operations to be that of a carrier.  Any advertising shall show the broker status of the operation.

49 C.F.R. §371.7(b).

The Carmack Amendment defines "motor carrier" as "a person providing motor vehicle transportation for compensation."  49 U.S.C. § 13102(14).  Federal regulations further clarify that:

> Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport.

49 C.F.R. § 371.2.

**THE PLUMLEY DEFENDANTS' ARGUMENT.**  PL contends that the Carmack Amendment

---

[1]Although whether a party acted as freight forwarder does not seem to be at issue here, a "Freight Forwarder" is defined as:

> a person holding itself out to the general public…to provide transportation of property for compensation and in the ordinary course of business—
> (A)     assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;
> (B)     assumes responsibility for the transportation from the place of receipt to the place of destination; and
> (C)     uses for any part of the transportation a carrier subject to jurisdiction under this subtitle.

49 U.S.C. §13102(8).

1  does not apply because PL is a freight broker and acted as a freight broker with regard to
2  the Shipment, and the Carmack Amendment does not apply to brokers.

3      PT contends that prior to this lawsuit, no one took the position that PT had
4  anything to do with the Shipment.  PT stresses it was not the carrier, it did not accept the
5  Shipment, did not agree to transport the Shipment or assume responsibility for the
6  transportation of the Shipment.  PT points out that Foster worked for PL and that PT and
7  PL are separate entities.

8      ASARCO maintains that there are factual disputes regarding the Plumley
9  Defendants' role regarding the Shipment.

10  **DISCUSSION.**  "Whether a company is a broker or a carrier is not determined by what the
11  company labels itself, but by how it represents itself to the world and its relationship to
12  the shipper."  *Hewlett Packard,* 373 F.Supp.2d at 1352 (citation omitted); *Chubb,* 243
13  F.Supp.2d at 1070 ("'[a] carrier's status as a common carrier is determined not by
14  reference to its authority but rather by reference to what it holds itself out to be.'"
15  (quoting *Ensco, Inc. v. Weicker Transfer and Storage Co.,* 689 F.2d 921, 925 (10th Cir.
16  1982)).  "The difference between a carrier and a broker is often blurry. The crucial
17  distinction is whether the party legally binds itself to transport, in which case it is
18  considered a carrier. *See* 49 C.F.R. § 371.2(a). That is, if [the defendant] accepted
19  responsibility for ensuring delivery of the goods, regardless of who actually transported
20  them, then [the defendant] qualifies as a carrier.  If however [the defendant] merely
21  agreed to locate and hire a third party to transport the [shipment], then it was acting as a
22  broker."  *CGU Intern. Ins., PLC v. Keystones Lines Corp,* 2004 WL 1047982, *2 (N.D.
23  Cal. May 5, 2004) (holding defendant was a broker because the agent worked for the
24  brokering division, there was never an understanding that defendant would assume
25  responsibility for shipping the goods, defendant never took physical possession of the
26  goods but was merely a conduit between the shipper and the carrier, and the contract
27  between defendant and carrier identified their roles).  The focus of the court's inquiry
28  must be on the Defendants' role in the specific transaction, and the nature of the

relationship between ASARCO, EL and the Plumley Defendants.  *See Schramm v. Foster,* 341 F.Supp.2d 536, 549 (D.Md. 2004).

Here, PL maintains it acted solely as a broker when it arranged for Pavlyukh Express to transport the Shipment, and PT contends it had absolutely nothing to do with the Shipment. (*See* Doc. 91, ¶11; Doc. 98, pp. 3-8; Doc. 109, ¶3, Doc. 91, Exh. A p.8 (Foster testified that PL "is a broker and we broker freight out to other carriers….I have customers that give me freight, and I find carriers to move that freight."))  The Plumley Defendants cite Foster's testimony that she is an employee of PL, which operates solely as a broker, and that PL never took possession of the Shipment.  Foster also testified that EL agents requested PL to find a carrier to transport the Shipment.  Further, a broker-carrier agreement for the Shipment identifies Pavlyukh Express as the "carrier" and PL as the "broker".  (Doc. 91, Exh. F, PL 0021-PL0023).

PL's interaction with EL is not as clear cut as PL contends.  EL agents Freeman and Whitlock testified that they believed Foster worked for PT[2] and neither knew of PL or had worked with PL.  (*See* Doc. 107, Exh. 2, pp. 48-49, 54 (Freeman) & Exh. 3, pp. 23, 30 (Whitlock); *see also* Doc. 91, Exh. B, p. 50).  Nor had PL "been set up as a vendor for…[EL]."  (Doc. 91, Exh. B, p. 30).  When Freeman "reached out to Tammy Foster with regard to this shipment", he thought he was reaching out to PT.  (Doc. 91, Exh. B, p. 54).  Both Freeman and Whitlock testified that in July 2011, the only two carriers authorized to rebroker[3] EL loads were PT and Mike's Trucking and Landstar. (Doc. 91, Exh. B, p. 17 (Freeman) & Exh. C, p. 24 (Whitlock)).  Freeman testified that PT was authorized to re-broker freight because "we had a really good relationship with Tammy [Foster].  She did a great job for us when she was at Landstar, and…she gave us no

---

[2] PL and PT are both corporations organized and existing under the laws of South Carolina (Doc. 107, Exh. 11); PL was formed in 2007 and PT was formed in 2003. (Doc. 99, Exh. A, ¶3).

[3] Rebrokering occurs when a broker refers a shipment to another broker to actually arrange for the transportation of the freight or when a carrier brokers a shipment rather than transports the shipment itself.  (Doc. 91, p.5 n. 3).

1    reason to feel that she couldn't do a good job for us at Plumley Trucking."  (Doc. 91,

2    Exh. B, pp. 17-18).   When asked whether he ever understood PT to be a broker in

3    addition to being a carrier, Freeman testified:  "Well, we made that distinction when we

4    allowed her [Foster] to subcontract loads out to other drivers."   (*Id.* at pp. 50-51).

5    Freeman stated that the decision to allow *PT* to broker loads to other carriers was made

6    after Foster "moved from Landstar to Plumley…."  (*Id.* at p. 50).  Freeman also testified

7    that at the time of the Shipment, PT was authorized by England to broker loads.  (*Id.* at p.

8    51).

9           Moreover, although Foster testified that EL asked her to find a carrier for the

10   Shipment, Whitlock testified that he did not remember whether he asked her to act as a

11   carrier (*i.e.*, "take this load for me") or to broker the load (*i.e.* "find somebody that can

12   take this load for us").  (Doc. 107, Exh. 3, pp. 43-44; *see also id.* at p. 44 (Whitlock's

13   communication with Foster would have been over the phone or through e-mail and he has

14   no written communications with Foster regarding the Shipment.)).

15          Whitlock testified that when Foster informed him on July 22, 2011, that Pavlyukh

16   Express was going to haul the Shipment, he believed that "Foster had rebrokered the

17   load[.]"  (Doc. 91, Exh. C, p. 52).  Although EL must give express permission for a load

18   to be rebrokered, Whitlock did not provide written confirmation that Foster could

19   rebroker the load, nor did he confirm that she had received any such confirmation.  (*Id.* at

20   pp. 52-53; *see also id.* at p. 52 ("In order for someone to rebroker loads, they have to

21   have permission from [EL] to do that.  We don't do that on every single load that they

22   haul.")  Whitlock had no objections to Pavlyukh Express, nor did he do any follow up to

23   determine whether Pavlyukh Express was a reliable carrier.  (*Id.* at pp. 53-54).

24          The record reflects that the load and rate confirmation for the Shipment lists PT as

25   the carrier.  (Doc. 91, p.4 n.1; *see also* Doc. 107, Exh. 1, pp. 41-42 (Foster testifying to

26   same)).  Foster testified that EL required that the name PT be used.  (Doc. 91, Exh. A, p.

27   131).

28          Based on the testimony, there is no question that EL agents thought they were

dealing with Foster as an employee of PT and they were not aware of PL's role. Whitlock's and Freeman's belief that they were dealing with PT through Foster is understandable given the manner in which PT and PL hold themselves out.  For example, at her deposition, Foster identified a business card bearing her name and stating "Plumley Trucking and Logistics, Incorporated".  (Doc. 107, Exh. 1, p. 17).  She testified that there is no such company and she could not explain why her business card read the way it did. (*Id.*).  She also testified that the website plumleytrucking.com reads:  "Plumley Trucking, Logistics, and Warehousing", which is a company that does not exist (*Id.* at pp. 19-21; *see also* Doc. 107, Exh. 9, p. 14 (Craig Plumley, President of PL and PT, also testifying there is no such business)).  Foster agreed that the website marketed Plumley Trucking, Logistics and Warehousing, Inc., as a one-stop shop for all of a shipper's transportation needs.  (Doc. 107, Exh. 1, p. 20).  Further, although the website states that "all of our equipment…is meticulously maintained…", it does not specify that the equipment belongs only to PT given that PL has no equipment.  (*Id.* at p. 22 (Foster testified that PL owned no trucking equipment)).  Finally, the portion of the website containing an application of employment for drivers does not specify whether the application is for employment with PL or PT.  (*Id*. at pp. 23-24).  Moreover, both PL and PT use the same phone number (which directs the caller via prompts to PT or PL) and fax number which goes to PT, (*Id.* at pp. 23-24(phone), 30 (fax)); operate out of the same building but in separate offices (*Id.* at p. 30); use the same phone system, Internet system and water system (*Id.*); and all PL invoices are directed to and paid by an employee for PT but, as far as Foster understands, the invoices are paid out of separate accounts.  (*Id.* at p. 33). Foster also testified that although she is an employee of PL, her paychecks "say" PT: "we have a payroll company, TLC, and Plumley Trucking is on that payroll company." (Doc. 91, Exh. A, p. 9; *see also* Doc. 113, Exh. 3, p. 9)).  Foster testified that she does no work for PT.  (Doc. 91, Exh. A, p. 9; Doc. 99, Exh. B, p.99.).

Craig Plumley, President of PT and PL (Doc. 99, Exh. A, ¶2), confirmed that PL and PT share the same Internet service, water, power, and phone service; however, a cost

sharing agreement "on everything" is in place:  "Any bills related to the building whether it be power, water, Internet, phone service, Logistics pays between 25 and 30 percent of those bills every month."  (Doc. 107, Exh. 9, p. 13- 14; *see also id.* at p. 10 (Craig Plumley is 100% owner of PT and PL, and all authority is vested in him as there is no Board of Directors for either corporation); Doc. 107, Exh. 4, PL 0172 (document on PT stationary dated January 2011 stating, in pertinent part:  PL "agrees to pay [PT] a percentage of utilities (including power, water, phone, internet, etc.) based on [PL] revenue.  This percentage can be paid monthly or yearly.")). Craig Plumley also stated that PT does not own PL and that PT is not responsible for the debts and liabilities of PL. (Doc. 99, Exh. A, ¶¶3-5).

According to Craig Plumley, PT did not agree to transport the Shipment, did not agree to arrange for such transport by another company, did not take possession of or transport the copper anodes at issue, and had no contact or communication with Pavlyukh Express or its driver Kuba regarding the Shipment.  (*Id.* at ¶¶7-11).  Instead, it was Foster through PL who searched for a carrier for the Shipment, selected and arranged for Pavlyukh Express or its driver Kuba to transport the Shipment, and who communicated with Pavlyukh Express or Kuba in July 2011 regarding the Shipment.  (*Id.* at ¶¶6-11).

On the instant record, the Court finds that factual issues exist concerning PL's and PT's role.  With regard to PL, the evidence of record could lead a reasonable fact finder to conclude that PL held it held itself out as part of the PT operation, which according to the website and Foster's card, appeared to provide both brokering and carrying services. *See, e.g. Schramm,* 341 F.Supp.2d at 549 ("A transportation entity may have authority to operate as both a broker and a carrier.").  As discussed *supra,* when analyzing whether an entity operated as a broker or a carrier, courts have looked to the understanding among the parties involved, which includes consideration of how the entity held itself out.[4]  *See id.* (defendant acted as a broker where, *inter alia,* "[n]othing in the record suggests that

_____

[4] ASARCO discusses the standard for piercing the corporate veil of the Plumley entities. However, for purposes of the Carmack Amendment, the focus is upon how PL held itself to the world and its relationship to EL and ASARCO.

[the shipper] believed [the defendant] was accepting responsibility to ship the load itself pursuant to its motor carrier authority."); *Chatelaine, Inc. v. Twin Modal, Inc.,* 737 F.Supp.2d 638, 642 (N.D. Tex. Aug. 2010) (holding defendant was a broker because "it only held itself out to arrange for transportation and facilitated the transaction between the buyer and the carrier.  [The defendant] arranged for [the carrier] to physically transfer the Product to its destination and, beyond being in communication with…[carrier's] driver, had no connection to its actual transportation."); *Chubb*, 243 F.Supp.2d at 1070 (holding defendant was a broker where the bill of lading identifying defendant as the carrier was written by third party and there was no showing that defendant represented to plaintiff that it would transport the items itself; instead, defendant's actions were consistent with those of a broker) *with Hewlett-Packard*, 373 F.Supp.2d at 1352 (question of fact existed where defendant's solicitations and statements suggest that defendant's "actions were not limited to arranging transport, but also exerting some measure of control over the[] drivers" by ensuring "consistent and timely transit times...."); *KLS Air Express, Inc.*, 2007 WL 2428294 at *4 (question of fact where defendant's advertising stated it was a carrier and did not state it was also broker, and shipper offered evidence that it intended defendant would be the carrier, defendant agreed to act as the carrier and never informed shipper it had arranged for another carrier, and defendant remained shipper's sole point of contact at all times).

  "An entity may be considered a motor carrier, as opposed to a broker, only if it engages in solicitation for its own account."  *Schramm*, 341 F.Supp.2d at 550 (citing *Global Van Lines, Inc. v. I.C C.*, 691 F.2d 773, 775 (5th Cir.1982)).  Upon  consideration of the evidence, a reasonable jury could certainly determine that PL and PT held themselves out as one operation involving both broker and carrier services.[5]  PL's representations on its website and Foster's card completely fail to identify PL as an entity separate from PT.  Further, the load and rate confirmation for the Shipment list PT as the

---

[5] Although brokers are not subject to liability under the Carmack Amendment, the actions of PL are so intertwined with the actions of PT that dismissal of the Carmack Amendment claim against PL would be inappropriate at this time.

1    carrier.  Although Whitlock could not remember whether he contacted Foster to carry the

2    Shipment or broker it, upon learning from Foster that Pavlyukh Express was going to

3    carry the Shipment, Whitlock thought that Foster, whom he and Freeman believed

4    worked for PT, had rebrokered the Shipment, which was something England authorized

5    PT to do and, thus, was consistent with EL's expectations of its dealings with PT as a

6    carrier.

7         As for PT, "[i]f [PT] accepted responsibility for ensuring delivery of the goods,

8    regardless of who actually transported them, then [PT] qualifies as a carrier [and

9    Carmack would apply].  If however [PT] merely agreed to locate and hire a third party to

10   transport the [Shipment], then it was acting as a broker."  *CGU International Insur.*, 2004

11   WL 1047982, *2 (May 5, 2004).  There is a question of fact regarding PT's involvement.

12   EL agents thought they were dealing with PT when they dealt with Foster.  As discussed

13   above, based on the manner that PT and PL held themselves out, a reasonable jury could

14   determine that PT was involved in the Shipment.  Moreover, Whitlock cannot remember

15   whether he asked Foster, whom he thought worked for PT, to broker or carry the load and

16   he ultimately thought that PT had "rebrokered" the load to Pavylukh Express.

17        PT goes on to argue that even if the Carmack Amendment applies, no timely claim

18   was filed against PT.  This is primarily because EL submitted a claim to Foster, who PT

19   contends works for PL and the claim names PL and does not mention PT.

20        There is no dispute that within the 9-month deadline for filing a claim under the

21   Carmack Amendment, ASARCO timely submitted a claim for the lost Shipment to EL,

22   which, in turn, submitted the claim to Foster.  (ASARCO's Statement of Facts in Support

23   of its MPSJ (Doc. 102), ¶8 & Exh. 8 pp. 26-27; Doc. 109, ¶7; *see also* Doc. 113, Exh. 1,

24   pp. 56-57).  Andre Andersen, EL's claims manager who tendered the claim to "Tammy

25   [Foster] at Plumley…" testified that he "was uncertain if [Foster is] specifically with

26   Plumley Trucking or Plumley Logistics."  (Doc. 102, Exh. 8, pp. 26-27; *see als*o Doc.

27   113, Exh. 1, p 57 (Freeman identifying Andersen as EL's claims manager)).   EL's

28   understanding is that the Plumley Defendants' insurance company denied the claim, as

did the insurance company for Pavlyukh Express.  (Doc. 102, Exh. 8, pp. 26-27).

Just as the issue of PL's and PT's role in this matter is a question for the jury, so is whether EL's tendering of the claim to Foster, who EL agents believed worked for PT, constituted tendering of the claim to PT as well as PL.

**BREACH OF CONTRACT CLAIM AGAINST THE PLUMLEY DEFENDANTS**

ASARCO brings this claim as an alternative claim if the Carmack Amendment claim fails.  If ASARCO's claim under the Carmack Amendment survives, then this claim is pre-empted.  *See Hall v. North Amer. Van Lines, Inc.,* 476 F.3d 683, 688 (9th Cir. 2007) ("It is well settled that the Carmack Amendment is the exclusive cause of action for interstate-shipping contract claims alleging loss or damage to property."). (*See also* Doc. 90, pp.12, 15; Doc. 108, p.8 n.5)).

ASARCO alleges that PT and PL breached contracts entered into by CR and PT in 2008 and EL and PL in 2010.  ASARCO contends that it is a third party beneficiary of the 2010 Agreement.  (Doc. 101, p. 3).  Both contracts are captioned "Transportation Brokerage Agreement".

A "Transportation Brokerage Agreement" ("2010 Agreement") dated November 3, 2010 between EL and PL identifies EL as a "Registered Broker" and PL as "a Registered Motor Carrier".[6]   (Doc. 91, ¶17 & Exh. J, PL 0007-0010)).   The 2010 Agreement is signed by R. Craig Plumley, President of PL.  (Doc. 91, Exh. J, PL 0010)).  There is no signature in the space reserved for an authorized representative of EL.  (*Id.*). In pertinent part, the 2010 Agreement provides at §I(j):

> CARRIER shall defend, indemnify and hold BROKER and its shipper customer harmless from any and all claims, actions, suits, demands, or damages, arising out of or related to CARRIER's acts, omissions, or performance under this Agreement, including, but not limited to, cargo loss or damage, theft, delay, damage to real or personal property, personal injury or death. The obligation to defend shall include any and all costs of defense as they accrue, including but not limited to attorney's fees from counsel of BROKER's choice.

---

[6] The Agreement is a form agreement in which the date and PL's name and DOT number are hand written in blank spaces provided for such information.

(*Id.* at PL 0007).  The 2010 Agreement also provides at §3(c)(ii) and (iii) that:

> ii. CARRIER's liability for any cargo damage, loss, or theft from any cause shall be determined under the Carmack Amendment, 49 U.S.C. § 14706; and
>
> iii.  Special Damages: CARRIER's indemnification liability herein for freight loss and damage claims shall include legal fees which shall constitute special damages, the risk of which is expressly assumed by CARRIER and which shall not be limited by any liability of CARRIER under sub par (ii) above.

(*Id.* at PL 0008).

The 2010 Agreement also contains a provision prohibiting the rebrokering of loads without the prior written consent of EL.  (Doc. 91, ¶21; Doc. 107, ¶21).

Foster, who participated in negotiating the 2010 Agreement with EL, testified that even though PL is a broker and not a carrier, PL entered into the Agreement identifying it as a "Carrier" because: "[EL] said if we were going to do business with them, that's the contract that we had to sign, so that's the contract that we signed."  (Doc. 91, Exh. A, pp. 53-54).   Foster had concerns about PL being labeled a "Carrier" in the Agreement, because she "wanted to make sure [EL]…knew we were brokering the freight and they were okay with it, and they were okay with it."  (Doc. 91, Exh. A, p. 55).

Foster testified that EL informed that the Agreement "was a corporate agreement, and they said it could not be amended.  The communication, as far as us brokering it, was between agent and agent."  (*Id.*; *see also id.* at p. 56 (EL "said they didn't have…" a broker-to broker agreement.)).  Foster described the agreement between agent and agent as follows:  "That means for Bret Freeman and Tammy Foster, we had the agreement.  And that's what Bret Freeman told me.  That was my understanding."  (*Id.* at p. 55).  She also testified that "brokers and brokers...have verbal agreements that the freight can be brokered, and we had ours via e-mail."  (*Id.* at p. 56).  When Foster "had a carrier that I was going to be sending to pick up freight at ASARCO[,] I would give [Freeman]…the carrier name and the driver's name that would be picking up the freight….And that was our agreement, that would be through e-mail."  (*Id.* at pp. 56-57).  Foster testified that based on that e-mail, EL would understand that PL was brokering a load and would know

1   who the carrier would be.  (*Id.* at p. 57).  Foster also testified that PL provided EL with a

2   copy of its broker authority.  (*Id.* at p. 123); however, ASARCO points out that EL

3   representatives testified they thought they were doing business with PT and did not know

4   of PL's existence.

5        When EL agent Freeman was presented with the 2010 Agreement at his

6   deposition, he testified that he was "not sure when…Plumley got this agreement, but it's

7   never been executed….[PL] has never been set up as a vender for [EL]."  (Doc. 91, Exh.

8   B, p. 30).  When asked whether he has ever worked with PL before, Freeman responded:

9   "I've worked with Plumley Trucking."  (*Id.*).

10       The load and rate confirmation for the Shipment lists PT as the carrier.  (Doc. 91,

11   p. 4 n. 1; *see also* Doc. 107, Exh. 1, pp. 41-42 (Foster testifying to same)).  However, PL

12   points to Foster's testimony when asked:

13       Q.      …the only reason that the name Plumley Trucking appears on any
                 documents related to the subject shipment is because England
14                Logistics requested that that name be used?

15       A.      [Foster]:  Yes.

16   (Doc. 91, Exh. A, p. 131).

17       Additionally, the following exchange took place at Craig Plumley's deposition:

18       Q.      …there are documents reflecting multiple loads being…shipped
                 under the name of Plumley Trucking through brokered loads from England
19                Logistics on behalf of shipper ASARCO.  Were you aware of that before
                 this litigation?
20
         A.      [Craig Plumley]:  Yes, ma'am.  As I stated earlier, when I filled out
21                that Broker Carrier Agreement with England Logistics and Tammy e-
                 mailed it to, I don't know who she was dealing with at England, they
22                refused to write the checks to Plumley Logistics.  They said it has to be set
23                up as Plumley Trucking.

24   (Doc. 99, Exh. C, p. 37).  Craig Plumley also testified that nothing came to mind during

25   Foster's testimony with which he disagreed and, in his view, Foster's testimony was

26   truthful and accurate.  (*Id.* at pp. 26-27).

27       The record also contains a March 2008 Transportation Brokerage Agreement

28   identifying CR as the "Broker" and "PT" as the "Carrier".  (Doc. 91, Exh. J, ENGRFP

000237).   The heading of that Agreement includes "C.R. England, Inc." and "England Logistics".  (Id.).   That Agreement is signed by a representative of PT and is not signed on behalf of CR or EL.   (*Id.* at ENGRFP 000239).   PL and ASARCO agree that this Agreement, like the 2010 Agreement, includes an indemnification clause and a provision prohibiting rebrokering of loads without prior consent.  (Doc. 91, ¶21; Doc. 107, ¶21).

**WHETHER THE AGREEMENTS APPLY TO THIS SHIPMENT.**   PL contends that the Agreements govern transactions in which CR/EL tenders a load for transportation, *i.e.*, a broker-to-carrier transaction.     Therefore, PL contends that the Agreements are inapplicable to the instant Shipment because the Shipment was tendered to PL to broker, not to transport, and the 2010 Agreement does not apply to broker-to-broker dealings between EL and PL.   (Doc. 90, p. 9).   PL also points to Freeman's testimony that the 2010 Agreement was never executed. (*Id.*).   According to PL, "[t]he general rule is where an instrument has been executed by only a portion of the parties purported to be bound thereby, the instrument is incomplete and never takes effect as a valid contract even against those who have executed it."  *Modular Sys. Inc. v. Naisbitt,* 114 Ariz. 582, 562 P.2d 1080, 1083 (App. 1977); *In re Gaynes,* 27 B.R. 161, 162 (9th Cir. 1983) ("The general rule for an enforceable contract to exist requires the signature of all parties to be bound.").

However, under both Arizona and Utah law[7], an exception to this general rule is that if the parties, by their actions recognize the validity of the agreement and acquiescence in its performance.   *See e.g. Muchesko v. Muchesko,* 191 Ariz. 265, 268, 944 P.2d 21, 24 (Ct. App. 1997); *Ellsworth v. American Arbitration Ass'n.,* 148 P.3d 983, 988 (Utah 2006) ("Performance my bind a party to a contract it has not signed."); *Ercanbrack v. Cransall-Walker Motor Co.,* 550 P.2d 723, 725 (Utah 1976) (It is a principal of "contract law contract law that the parties may become bound by the terms of a contract even though they did not sign the contract, where they…have otherwise

---

[7] Under the Agreement, Utah law governs.  PL contends that because the Agreement was never in force, Arizona law applies.  (PL's Response in Opposition to ASARCO's MPSJ (Doc. 108), p. 3 n.1).

indicated their acceptance of the contract, or led the other party to so believe that they have accepted the contract."); *Commercial Union Assoc. v. Clayton,* 863 P.2d 29, 34 (Utah Ct. App. 1993) ("It is…established that the purpose of a signature is to demonstrate 'mutuality of assent' which could as well be shown through the conduct of the parties.") (citation omitted).

A question of fact exists as to the application of the Agreements to the Shipment. First, if a jury determines that PT agreed to carry the load, then the 2008 Agreement arguably applies. Second, Foster's testimony establishes that PL entered into the 2010 Agreement despite reservations about being labeled a "Carrier." ASARCO persuasively points out that "[i]t makes no sense for [PL] to argue that the relevant agreement is not controlling or applicable when that agreement was a condition precedent to it doing business with England." (ASARCO Opposition to PL's MSJ (Doc. 106), p. 10). ASARCO further stresses that, despite PL's claim that the Agreement is inapplicable because PL is labeled as a "Carrier," its contract claim arises from the obligations that PL accepted to do business with England. (*Id.*). According to ASARCO, PL promised to become the insurer for England and ASARCO in the event that any damage arose in connection with PL's acts. ASARCO further argues that PL brokered the Shipment to Pavlyukh Express in a manner contrary to its obligations under the contract and/or law. (*Id.*). Moreover, it seems nonsensical for EL and PL to enter into a contract where PL is identified as a "Carrier" given that PL is not an authorized carrier but is an authorized broker—thus making Foster's version more believable.

ASARCO also cites the Agreement's Integration Clause to override any argument that some other verbal agreement governed EL's and PL's actions concerning the Shipment. The Integration Clause provides:

> ENTIRE AGREEMENT:…unless otherwise agreed in writing, this Agreement contains the entire agreement and understanding of the Parties and supersedes all verbal or written prior agreements, arrangements, and/or understanding of the Parties relating to the subject matter stated herein. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence may be

- 17 -

introduced to reform this Agreement in any judicial or arbitration proceeding involving this Agreement.

(Doc. 118, p.4 (citing Doc. 102, ¶1; Doc. 107, Exh. 12)).  ASARCO stresses that "[t]o attempt to claim that some other unproduced 'side' or 'verbal' agreement applies to the Shipment is to, again, ignore the very terms of the Agreement."  (Doc. 118, p. 5).

ASARCO also persuasively points out that saying that rebrokering loads falls outside the scope of the Agreement is to ignore its very terms given that the Agreement explicitly contemplates the rebrokering of loads to other carriers, noting that: "CARRIER [*i.e.,* PL] will not re-broker, co-broker, subcontract, assign, interline, or transfer shipments hereunder without prior written consent of BROKER [*i.e.,* EL]."  (Doc. 118, p.5 (citing Doc. 102, ¶5)).  However, Whitlock testified that although such confirmation is required, "[w]e don't do that on every single load they haul."  (Doc. 91, Exh. C, p. 52).

On the instant record, PL has failed to establish that no factual issues exist as to whether the 2010 Agreement covered the transaction and, thus, PL's motion should be denied on this issue.  Additionally, because factual issues remain as to whether the 2010 Agreement applied to the Shipment and given EL agents' confusion as to whether they were dealing with PT or PL and Freeman's position that PL was not an authorized vendor, ASARCO's MPSJ is denied.

Likewise, factual issues remain for the jury's determination regarding PT's role with the Shipment.  PT contends that the Agreement between it and the England Defendants is not applicable because "it only applies to shipments [PT] actually transported as a motor carrier" and PT did not act as a motor carrier or freight forwarder, did not take possession of the copper anodes or directly or indirectly transport them from ASARCO's Hayden facility, did not agree to transport the Shipment and "did not re-broker or subcontract the [S]hipment."  (Doc. 98, p. 11)

ASARCO counters that, consistent with the contracts, PT acted as the initial carrier who accepted responsibility for the Shipment.  (Doc. 98, p. 6).  A reasonable jury could conclude that this is the case given the manner in which PT and PL held themselves

out and the EL agents' testimony that they thought they were dealing with PT.  At bottom, factual issues remain as to whether the Agreement(s) applied to the Shipment.

**WHETHER THERE WAS A BREACH.**  PL argues that even if the Court determines the Agreement is enforceable, there was no breach.  PL cites Freeman's and Whitlock's testimony that PT was authorized to rebroker loads.  (Doc. 90, pp. 10-11 (citing Doc. 91, ¶¶24, 25)). To get around the fact that Freeman and Whitlock referred to PT and not PL, PL argues that EL's decision to allow PT to rebroker loads was based upon its relationship to Foster, who is an employee of PL and not PT.  (Doc. 90, p. 10, n. 4 (citing Doc. 91, ¶24).  Moreover, upon learning that Pavlyukh Express would be the carrier transporting the Shipment, Whitlock did not lodge an objection.  Thus, PL contends there was no breach when the load was assigned to Pavlyukh Express.

Further, PL contends the contract required only that PL indemnify EL, not ASARCO.  (Doc. 90, p. 11). PL "as a broker agreed only to arrange for the transportation of the Shipment[,]…[PL] fulfilled this obligation, and because the claims do not stem from the failure to arrange for the transportation, the claims do not arise out of [PL's] acts or omissions, or out of the performance of an agreement between [PL] and [EL].  Instead, the claims arise solely from the criminal acts of a third-party in stealing the Shipment." (Doc. 90, p. 12).

ASARCO counters that its "breach of contract claim has nothing to do with [PL's] selection of Pavlyukh."  (Doc. 118, p. 5).  Instead, ASARCO's claim arises under the Agreement's indemnity provision requiring PL to "defend, indemnify and hold [EL and [its shipper customer, *i.e.,* ASARCO] harmless from any and all claims, actions, suits, demands, or damages, arising out of or related to [PL's] acts, omissions or performance under this Agreement including, but not limited to, *cargo loss or damage, theft,* delay, damage to real or personal property…."  (*Id.* at 6 (citing Doc. 102, ¶1) (emphasis in original)).  According to ASARCO, "[t]o say that the Agreement allows [PL] to "pass the buck" to a carrier after they are selected is illogical and untenable.  Indeed, the very *purpose* of the indemnity provision is to provide an avenue of recovery for issues with delivery of shipments….[PL] agreed to act as insurer and indemnify against any cargo

loss, damage, or theft of shipment it carried *or re-brokered* under the Agreement.   In other words, the Agreement specifically contemplates [PL's] indemnification of a shipper for cargo, loss, damage or theft—the very scenario presented here."   (*Id.*) (emphasis in original).

On this record, factual disputes remain as to whether the Agreement(s) applied and whether a breach occurred.   Consequently, PL's, PT's and ASARCO's Motions are denied as to the breach of contract claim.

**STATE-LAW NEGLIGENCE CLAIMS AGAINST ALL DEFENDANTS**

ASARCO alleges that all Defendants were negligent.   ASARCO acknowledges that it cannot pursue these claims against the Plumley Defendants if the Carmack Amendment applies to them.

ASARCO alleges that PL and PT breached their duties hiring Pavlyukh Express, a newly formed carrier who did not have an established history, and that PT and PL failed to exercise due care to ensure the Shipment's delivery in good condition and to protect the Shipment.   (FAC, ¶¶69-70).   ASARCO alleges that the England Defendants, were negligent in selecting PT and or PL "to deliver the shipment because, among other reasons, PT and/or PL did not properly vet carriers who transported shipments…." (FAC, ¶67).   ASARCO alleges that all Defendants were negligent in hiring, retaining and supervising Pavlyukh Express.  (FAC, Count III).

All Defendants argue that ASARCO's negligence claims are pre-empted under 49 U.S.C. § 14501, which is referred to interchangeably as the Federal Aviation Administration Authorization Act ("FAAAA") and the Interstate Commerce Commission Termination Act ("ICCTA") (Doc. 90, p.13 n.5):  Pursuant to §14501,

> a State…may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier…or any private motor carrier, broker or freight forwarder with respect to the transportation of property.

49 U.S.C. §14501(c)(1); *see also Ameriswiss Tech., LLC v. Midway Line of Ill., Inc*., 888 F.Supp.2d 197, 204 n.7 (D.N.H. 2012) ("The ICCTA preemption provision had been part of the…[FAAAA] passed by Congress in 1994."  (internal quotation marks and citation

omitted)).  For purposes of §14501(c), "[s]tate common law counts as an 'other provision having the force and effect of law.'"  *Ameriswiss Tech., LLC,* 888 F.Supp.2d at 204 n. 6 (quoting *Non Typical, Inc. v. Transglobal Logistics Grp., Inc*., 2012 WL 1910076 at \*2 (E.D. Wis. May 28, 2012)).  Because the provisions of § 14501 "closely parallel those found in the Airline Deregulation Act of 1978 ('ADA'), codified at 49 U.S.C. § 41713(b)(4)(A) and 49 U.S.C. §41713(b)(4)(B)(i)…", courts have interpreted the preemptive scope of §14501(c) in accordance with case law addressing the ADA. *Huntington Operating Corp. v. Sybonny Exp., Inc*., 2010 WL 1930087 at \*3 (citations omitted); *see also Works v. Landstar Ranger, Inc.*, 2011 WL 9206170 \*1 (C.D. Cal. 2011).

> In interpreting this provision, the Supreme Court has determined:

> (1) that "[s]tate enforcement actions having a connection with, or reference to," carrier "'rates, routes, or services' are pre-empted," …; (2) that such pre-emption may occur even if a state law's effect on rates, routes, or services "is only indirect," …; (3) that, in respect to pre-emption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation, …; and (4) that pre-emption occurs at least where state laws have a "significant impact" related to Congress' deregulatory and pre-emption-related objectives, ….

*Rowe v. New Hampshire Motor Transp. Ass'n.*, 552 U.S. 364, 370-71 (internal citations and punctuation omitted) (quoting *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 383-34, 390 (2008)).  The Court has also stated that "[a] regulation is 'related to' prices, routes, or services when it affects those prices, routes, or services in a manner that is more than 'tenuous, remote, or peripheral [such as state laws forbidding gambling].'" *Works*, 2011 WL 9206170 at \*1 (quoting *Morales*, 504 U.S. at 383-34; *see also Rowe*, 552 U.S. at 371 (noting that the *Morales* Court "did not say where, or how, 'it would be appropriate to draw the line[.]'") (quoting *Morales*, 504 U.S. at 390).

Under *Rowe*, state laws are pre-empted when they "produce[] the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide."  *Rowe*, 552 U.S. at 372 (quoting

*Morales,* 504 U.S. at 378).   Pre-emption will also occur where the state regulation requires services "that differ significantly from those that, in the absence of the regulation, the market might dictate."   *Id.*   (regulation requiring shipper to use carrier who will verify tobacco buyer's age was pre-empted).   At bottom, courts have recognized that §14501 "broadly" pre-empts state law claims that would regulate interstate transportation of goods.   *Huntington Operating Corp.*, 2010 WL 1930087 at *3 (citation omitted); *Chatelaine, Inc.*, 737 F.Supp.2d at 642 (citation omitted); *AIG Europe Ltd. v. General Sys., Inc*., 2014 WL 3671566, *3(D. Md. July 22, 2014).

The Ninth Circuit has interpreted the term "service" as used in the ADA "narrowly because Congress intended to 'preempt only state laws and lawsuits that would adversely affect the economic deregulation of, and the forces of competition within' the industry it meant to deregulate."   *Works*, 2011 WL 9206170 at *1 (quoting *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1261 (9th Cir. 1998) (en banc), *amended*, 169 F.3d 1703 (9th Cir. 1999)).   The parties disagree about the viability of *Charas* after *Rowe*. Regardless, "the Court must look to the nature of the particular claim advanced."   *Ko v. Eva Airways Corp*., 2012 WL 11851427, *4 (C.D. Cal. Feb. 23, 2012). Thus, in determining whether §14501 pre-empts state claims, "the Court must determine whether Plaintiffs' common law negligence claims are 'related to' (that is, have a connection with) a price, route or service of [defendant broker] with respect to the transportation of property."[8]   *Owens v. Anthony*, 2011 WL 6056409, *2 (M.D. Tenn. 2011) (personal injury negligence claims were not pre-empted by §14501).

ASARCO relies heavily on a decision from the District Court for the Central District of California in *Works v. Landstar Ranger, Inc.,* 2011 WLL 9206170 at *1. There, the shipper plaintiff alleged that the broker defendant was negligent in hiring the

---

[8] Section 14501 carves out an exception for state regulatory authority by expressly stating that the provisions of §14501(c) "shall not restrict the safety regulatory authority of a State with respect to motor vehicles."  49 U.S.C. § 14501(c)(2).  *Owens*, 2011 WL 6056409 at *2.  In cases where personal injury is alleged, even if the claim has a connection to prices, routes or services, courts will go on to "determine whether such claims are 'saved' under the safety regulatory authority exception."  *Id.*  ASARCO does not allege that the safety authority exception applies; thus, the Court foregoes that portion of the analysis.

carrier, who delivered damaged goods, and that the broker committed fraud in an attempt to cover up that negligence.  *Id.* The court held that such claims were not pre-empted under §14501(c) given that:

> Neither the delivery of damaged goods, nor an attempt to cover up that damage, has more than a tenuous, remote, or peripheral effect on [defendant broker's] "prices, schedules, origins and destinations of the point-to-point transaction of passengers, cargo, or mail."  Plaintiff's negligence and fraud claims merely seek to enforce a normal duty of care and a duty not to defraud one's customers.  This had nothing to do with the service offerings—*i.e.*, its schedules, origins, or destinations-by [defendant broker] of the carriers with which it contracts.

*Id.* at *2 (denying motion to dismiss).

In contrast to the *Works* decision, PL and all other Defendants contend that §14501 pre-empts state law negligence claims against brokers.  *See. e.g. Ameriswiss Tech.,* 888 F.Supp.2d at 206 (§14501 expressly pre-empted plaintiff's claims against a broker for negligence and bailment when plaintiff's property was damaged in transport from one place to another) (citing cases holding §14501 pre-empted negligence claims against brokers)).  In holding that state law negligence claims are pre-empted, courts have found persuasive the fact that §14501(c) expressly includes "brokers".  *See id.*; *Non-Typical*, 2012 WL 1910076 at *3 (court also found persuasive that given the amount of damages sought on the negligence claim, permitting such a claim to go forward would have an economic effect on the rates the broker charges and how it provides transportation services); *AIG Europe Ltd,* 2014 WL 3671566 at *4 (§14501 pre-empts claim against broker for negligence in failing to advise shipper that carrier was underinsured because "[t]he claim clearly relates to the service provided by a broker."); *Huntington Operating Corp.*, 2010 WL 1930087 (§14501 pre-empted claims against broker for failure to ensure carrier had adequate insurance coverage, negligence, negligent misrepresentation, and violation of state deceptive trade practices act).

This Court respectfully disagrees with the decision in *Works.*  A fair and common-sense construction of the term "services", whether read broadly or narrowly with regard to a "broker" reasonably leads to no other conclusion than that a broker must find a

reliable carrier to deliver the shipment.  Holding a broker responsible for negligence on the instant facts would certainly have more than a tenuous, remote or peripheral effect on rates and services.  Consequently, ASARCO's negligence claims against the Plumley and England Defendants are pre-empted under §14501[9] and all Defendants are entitled to summary judgment on ASARCO's negligence claims alleged in Counts II and III of the First Amended Complaint.

The Court recognizes that if the Carmack Amendment does not apply and ASARCO's common law negligence claims are pre-empted under §14501, then there may be little, if no, recourse for ASARCO.   The *Ameriswiss* court succinctly acknowledged this point:

> because the Carmack Amendment creates a federal statutory remedy against motor carriers only, when a state common-law claim against a motor private carrier or a broker is preempted by 49 U.S.C. § 14501(c)(1), a plaintiff is left with no claim at all against a defendant who has successfully invoked preemption. While that may seem to be an anomalous result of the interplay between the ICCTA preemption provision and the Carmack Amendment, there is no good basis for arguing that Congress did not intend that result, given its interest in standardizing and simplifying the adjudication of claims arising in the context of interstate shipping. *See Rini* [*v. United Van Lines, Inc.*],104 F.3d [502] at 504 [1st Cir. 1997]. Moreover, the ICCTA preemption provision was enacted long after the Carmack Amendment, *see* Robert D. Moseley, Jr. & C. Fredric Marcinak, *Federal Preemption in Motor Carrier Selections Cases Against Brokers and Shippers*, 39 Transp. L.J. 77, 79 (2012), and, presumably, was enacted with the Carmack Amendment in mind. Finally, it is worth bearing in mind that a plaintiff that loses its common-law claim against an entity such as a broker is not denied an avenue for recovery; such a plaintiff still has its Carmack Act claim against the carrier.

---

[9] PT argued that ASARCO's state-law negligence claims were pre-empted by the Carmack Amendment, but cited §14501 as authority.  (Doc. 98, p. 11; Doc. 119, pp. 4, 6).  The England Defendants argued that the negligence claims were pre-empted by both §14501 and the Carmack Amendment.  Because the Court has determined that the negligence claims are pre-empted under §14501, the Court does not address whether the claims would also be pre-empted by the Carmack Amendment.

*Amerswiss*, 888 F.Supp.2d at 207 (footnote omitted).  However, as discussed elsewhere in this Order, if the Carmack Amendment does not apply, ASARCO may pursue its alternative breach of contract claims.

**BREACH OF CONTRACT CLAIM AGAINST THE ENGLAND DEFENDANTS.**

ASARCO alleges that it and the England Defendants entered into a contract for the transportation of goods with a reliable carrier and that the England Defendants breached the contract "when they failed to arrange for the shipment of ASARCO's property with reliable, reputable, and trustworthy carriers (i.e., PT, PL, and/or Pavlyukh)."  (FAC, ¶ 87-88).  ASARCO also alleges that the England Defendants promised to administer the loss claim relating to the Shipment and that the England Defendants breached the contract "when they did not timely and/or properly administer the loss claim relating to the Shipment."  (*Id.*).  It is undisputed that EL had no written contract with ASARCO.  (Doc. 103, ¶10; Doc. 115, ¶10).

There is no evidence that the England Defendants breached the contract by dealing with the Plumley Defendants.  Nor is there any evidence in the record that the England Defendants had anything to do with selecting Pavylukh Express.  Instead, the record supports the conclusion that until the incident with the instant Shipment, England had positive dealings with Foster, and PT was one of only two companies that EL had authorized to rebroker loads.  Thus, there is no question of fact as to whether the England Defendants breached the contract by doing business with the Plumley Defendants or by Foster's selection of Pavylukh Express and summary judgment shall be entered in favor of the England Defendants on this portion of the breach of contract claim.  However, a question of fact exists as to whether the claim was properly administered given PT's argument that the claim was tendered to PL and not PT.  EL states in its Motion that it "brokered the load to co-defendant Plumley Trucking…as the carrier to actually transport the load."  (Doc. 100, p. 2).  Yet, EL claims manager Andersen stated that he tendered the claim to Foster, although he is uncertain whether she works for PL or PT.  (*See,* Doc. 102, Exh. 8, pp. 26-27; *see also* discussion *supra* addressing PT's argument that the loss claim was not timely filed under the Carmack Amendment).  Therefore, the Court will

address the England Defendants' arguments with regard to the portion of the breach of contract claim that involves EL's submission of the loss claim.

The England Defendants point out that all counts in the FAC, other than the Carmack Count which does not name them, are pled in the alternative. (England Defendants' MSJ (Doc. 100), p. 3). As to the alternative claims, the FAC states: "ASARCO asserts this…claim in the alternative and in the event the Court determines that Carmack is not applicable in this case." (FAC, ¶¶ 64, 75, 86, 92). The "alternative" claims against CR/EL allege breach of contract and state law negligence claims. (Id. at ¶¶67-68, 74-84). According to the England Defendants, the Carmack Amendment and the ICCTA provide the exclusive framework for dealing with losses of interstate shipments and pre-empt all other claims alleged in the FAC.

At this point in the litigation, whether the Carmack Amendment applies is a question to be determined by the trier of fact. Moreover, the Court is not persuaded by the England Defendants' argument that any breach of contract claim is pre-empted by §14501 or the Carmack Amendment. As to §14501, it cannot be said that damages for breach of contract would "produce[] the very effect that the federal law sought to avoid[]." *Rowe,* 552 U.S. at 372. The statute (*i.e.,* the ADA) upon which § 14501 is based, "does not preempt 'state-law-based court adjudication of routine breach-of-contract claims' as long as there is 'no enlargement or enhancement [of the contract] based on state laws or policies external to the agreement.'" *Chatelaine, Inc.,* 737 F.Supp.2d at 641 (quoting *American Airlines, Inc. v Wolens*, 513 U.S. 219, 232-33 (1995)). This is so because the "ADA was designed to promote 'maximum reliance on competitive market forces,' and 'market efficiency requires effective means to enforce private agreements.'" *Id.* (no pre-emption of state law contract claim) (quoting Wolens, 513 U.S. at 230).

The England Defendants also rely on the *Ameriswiss* decision from the New Hampshire District Court to argue that the claim is pre-empted by the Carmack Amendment. The *Ameriswiss* court held "the Carmack Amendment impliedly preempts state regulations related to damages for the loss or destruction of property during the

course of interstate shipment[]" and went on to hold that, if the defendant was a broker[10], the shipper's claims for negligence and bailment would still be impliedly pre-empted under Carmack because the role played by the defendant fell within the Amendment's covered transportation services as being "services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit,…storage, handling, packing [and] unpacking." *Id.* at 205 (internal quotation marks and citation omitted).

The *Ameriswiss* decision is inapposite. That court's pre-emption discussion did not include the plaintiff's breach of contract claim; instead, after holding that negligence and bailment claims were pre-empted, the court went on to address the breach of contract claim on the merits. *See id.* at 208-11. Further, because the Carmack Amendment does not apply to brokers, it is questionable that such a law could pre-empt claims against brokers. It follows that because the Carmack Amendment does not apply to brokers, the Carmack Amendment's definition of "covered transportation services" cited by *Ameriswiss* must only apply to such services when performed by entities such as carriers or freight forwarders, which are covered by the statute. *See e.g. CGU,* 2004 WL 1047982 at *2 (the Carmack Amendment applies to a carrier even if that carrier only accepted responsibility for ensuring delivery of the goods, regardless of who actually transported them). Consequently, the England Defendants' argument that the breach of contract claim is pre-empted is denied and the claim that they breached the agreement to present a Carmack loss claim remains.

**WHETHER CR ENGLAND IS A VIABLE DEFENDANT**

The England Defendants contend that although CR is a related, but not separate entity from EL, CR had nothing to do with the loss at issue. (Doc. 100, p. 5). "Plaintiff has proffered zero evidence that CR has any involvement whatsoever with the shipment at issue, the loss of the shipment, or the brokering of the shipment." (Id.).

ASARCO, citing to various records suggesting that CR and EL were at one time one entity, contends that CR's involvement in brokering the Shipment is a disputed issue

---

[10] The *Ameriswiss* court declined to decide whether the defendant was a carrier or broker. *Ameriswiss,* 888 F.Supp.2d at 205.

- 27 -

of material fact. *See e.g.* (Doc. 115, Exh. 3, p. 21; Doc. 115, Exh. 4; Doc. 114, p.5).  The record reflects that ASARCO contacted EL agents to broker the Shipment and that ASARCO submitted a claim for the lost Shipment to EL.  (*See* Doc. 102, ¶7 & Exh. 8, pp. 26-27; Doc. 107, ¶9; *see also* Doc. 113, Exh. 1, pp. 56-57).  ASARCO as the party opposing CR's Motion for Summary Judgment has failed to point to evidence creating a genuine issue of material fact as to whether CR had any involvement with the Shipment.  CR's Motion for Summary Judgment is granted.

**CONCLUSION**

For the foregoing reasons, questions of fact exist for the jury's determination as to the role the Plumley Defendants played in the transactions at issue and, alternatively whether the Plumley Defendants' Agreements with the England Defendants apply to the Shipment and were breached.  Additionally, ASARCO's breach of contract claim against EL with regard to filing the loss claim is not pre-empted.  Consequently, ASARCO's claims under the Carmack Amendment against the Plumley Defendants and alternative claims for breach of contract against the Plumley Defendants and EL must be determined by the trier of fact.  However, ASARCO has failed to carry its burden as to its claims against CR.  Moreover, ASARCO's state law negligence claims against all Defendants are pre-empted by §14501.  Accordingly,

IT IS ORDERED that:

(1)  Plumley Logistics' Motion for Partial Summary Judgment (Doc. 90) is GRANTED IN PART AND DENIED IN PART.  The Motion is GRANTED with regard to ASARCO's state law negligence claims (Counts II and III).  The Motion is DENIED with regard to ASARCO's claim under the Carmack Amendment (Count I) and alternative claim for breach of contract (Count V);

(2)  ASARCO's Motion for Partial Summary Judgment (Doc. 101) against Plumley Logistics on the breach of contract claim (Count V) is DENIED;

(3) Plumley Trucking's Motion for Summary Judgment (Doc. 98) is GRANTED IN PART AND DENIED IN PART.  The Motion is GRANTED with regard to

ASARCO's state law negligence claims (Counts II and III).  The Motion is DENIED with regard to ASARCO's claim under the Carmack Amendment (Count I) and alternative claim for breach of contract (Count V); and

(4)     The England Defendants' Motion for Summary Judgment (Doc. 100) is GRANTED IN PART and DENIED IN PART.  The Motion is GRANTED as to all claims asserted against CR England. The Motion is also GRANTED with regard to ASARCO's claims against England Logistics alleging state law negligence (Counts II and III) and that portion of Count IV alleging breach of contract in arranging for the Shipment to be transported.  The Motion is DENIED as to that portion of ASARCO's breach of contract claim (Count IV) against England Logistics regarding the timely and proper administering of the loss claim relating to the Shipment.

Dated this 22nd day of December, 2014.

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**